## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**CHRISTOPHER MCKEMIE**                                   **CIVIL ACTION**

**VERSUS**                                                         **NO.   15-5752**

**N. BURL CAIN, WARDEN**                                  **SECTION: "G"(5)**

## <u>REPORT AND RECOMMENDATION</u>

This matter was referred to the undersigned United States Magistrate Judge to conduct a hearing, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.    Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing. *See* 28 U.S.C. § 2254(e)(2).    For the following reasons, **IT IS RECOMMENDED** that the petition for *habeas corpus* relief be **DISMISSED WITH PREJUDICE** as untimely.

### *Procedural History*

Petitioner, Christopher McKemie, is a convicted inmate incarcerated in the Louisiana State Penitentiary in Angola, Louisiana.    McKemie was charged with aggravated rape of a juvenile in violation of Louisiana Revised Statute 14:42.[1]    Following a three-day trial, on

---

[1]  State Rec., Vol. 1 of 3, 32nd Judicial District, Parish of Terrebonne, Bill of Indictment.

September 13, 2006, a jury found him guilty as charged.[2]    On February 12, 2007, the trial court dismissed his *pro se* motion to quash the indictment and denied the motion for new trial.[3]    However, the court granted a post-verdict judgment of acquittal finding that the evidence was insufficient to prove penetration, and entered a verdict of guilty of sexual battery.[4]    The State successfully challenged that ruling on supervisory review with the court of appeal, which held that the scope of review did not extend to credibility determinations, but rather only sufficiency of the evidence, and reinstated the aggravated rape conviction.[5]    On November 9, 2007, McKemie was sentenced to life imprisonment for aggravated rape.[6]

On direct appeal, McKemie raised two assignments of error: (1) the evidence was insufficient to convict him of aggravated rape and (2) the trial court erred in denying his

---

[2] State Rec., Supplemental Vol. 1 of 1, Minute Entry, 9/13/06; State Rec., Vol. 1 of 3, Jury Verdict.

[3] State Rec., Vol. 1 of 3, Motion for New Trial and Supplemental Motion for New Trial, Motion for Judgment N.O.V., Motion to Quash Indictment.

[4] State Rec., Supplemental Vol. 1 of 1, Minute Entry, 2/12/07.    As noted on direct appeal, the original "motion for judgment notwithstanding the verdict" was orally amended by defense counsel at the hearing held October 9, 2006, to a motion in arrest of the verdict. The trial court considered the motion as one for post-verdict judgment of acquittal pursuant to Louisiana Code of Criminal Procedure article 821.

[5] *State v. McKemie*, 2008-KA-2093, 2009 WL 3030743, at *1 (La. App. 1st Cir. 9/11/09) (citing *State v. McKemie*, 2007-1389 (La. App. 1st Cir. 9/7/07) (unpublished)).

[6] State Rec., Supplemental Vol. 1 of 1, Minute Entry, 11/9/07, *see also* State Rec., Vol. 1 of 3, Transcript of Sentencing, (November 9, 2007).

supplemented motion for a new trial based on jury misconduct.    On September 11, 2009, the Louisiana First Circuit Court of Appeal affirmed the conviction and sentence.[7]    On April 9, 2010, the Louisiana Supreme Court denied his application for a writ of certiorari.[8]

On February 17, 2014, McKemie submitted an application for post-conviction relief with the state district court in which he argued that he received ineffective assistance of counsel.[9]    The district court denied his post-conviction application as untimely on March 26, 2014.[10]    On April 21, 2014, McKemie filed a related writ application in the Louisiana First Circuit Court of Appeal.    The court of appeal denied relief as untimely on July 28,

---

[7] *State v. McKemie*, 2008-KA-2093, 2009 WL 3030743 (La. App. 1st Cir. 9/11/09). *See* State Rec., Vol. 1 of 3 (unpublished opinion).

[8] *State v. McKemie*, 2009-K-2215 (La. 4/9/10), 31 So.3d 382.

[9] State Rec., Vol. 1 of 3, Uniform Application for Post-Conviction Relief.    The signature date on the certificate of service is February 17, 2014.    Federal *habeas* courts must apply Louisiana's "mailbox rule" when determining the filing date of a Louisiana state court filing, and therefore such a document is considered "filed" as of the moment the prisoner "placed it in the prison mail system."    *Causey v. Cain*, 450 F.3d 601, 607 (5th Cir. 2006).    If that date cannot be gleaned from the state court record with respect to the filing, this Court will use the signature date of the applications as the filing date, in that the various applications were obviously placed in the mail no earlier than the date they were signed.    In those instances where no signature date appears on a document and no other evidence is available, the Court will look to the file-stamp placed on the document by the clerk of court.

[10] State Rec., Vol. 1 of 3, District Court Order denying post-conviction relief signed March 26, 2014.

2014.[11]    On April 15, 2014, he filed a supervisory writ application with the Louisiana Supreme Court.    The Supreme Court denied relief as untimely on August 28, 2015.[12]

On October 21, 2015, McKemie filed his federal application for *habeas corpus* relief.[13] In his petition, McKemie asserts the following grounds for relief: (1) the evidence was not sufficient to support his conviction for aggravated rape; (2) the trial court erred in denying his motion for new trial based on juror misconduct; and (3) trial counsel was ineffective for failing to investigate, present a defense and retain an expert witness.    The State filed a response and memorandum in opposition arguing that the federal application is untimely, the first two claims are procedurally defaulted, and the third claim fails on the merits.[14] McKemie filed a reply to that response.[15]    He concedes that his federal application was not timely filed, but argues that equitable tolling applies.

---

[11]  State Rec., Vol. 3 of 3, Louisiana First Circuit Writ Application No. 2014-KW-0610 dated April 21, 2014; Supplemental Vol. 1 of 1, *State v. McKemie*, 2014-KW-0610 (La. App. 1st Cir. July 28, 2014) (unpublished writ ruling).

[12]  State Rec., Supplemental Vol. 1 of 1, Louisiana Supreme Court Writ Application No. 14-KH-1780 with certificate of service signed April 15, 2014 (not postmarked until August 18, 2014); *State ex rel. McKemie v. State*, 14-KH-1780 (La. 8/28/15), 175 So.3d 399.

[13]  Rec. Doc. 3, 28 U.S.C. § 2254 Petition for Writ of Habeas Corpus signed and dated October 21, 2015.

[14]  Rec. Doc. 11.

[15]  Rec. Doc. 12.

*Analysis*

Initially, the Court must determine whether the petition is timely and whether the claims raised by the petitioner were adjudicated on the merits in state court; *i.e.*, the petitioner must have exhausted state court remedies and the claims must not be in "procedural default."    *Nobles v. Johnson*, 127 F.3d 409, 419–20 (5th Cir.1997) (citing 28 U.S.C. § 2254(b), (c)).    For the following reasons, the Court finds the petition to be untimely.

A. *Statute of Limitations*

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified at 28 U.S.C. § 2241 *et seq*., governs the filing date for this action because McKemie filed his *habeas* petition after the AEDPA's effective date.    *Lindh v. Murphy*, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).    Title 28 U.S.C. § 2244(d) provides, in pertinent part:

(1)    A 1–year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—

A.    the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

B.    the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

C.    the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

D.    the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).

The AEDPA generally requires that a petitioner bring his Section 2254 claims within one (1) year of the date on which his underlying criminal judgment becomes "final."    With regard to finality, the United States Fifth Circuit Court of Appeals has explained:

> The statute of limitations for bringing a federal habeas petition challenging a state conviction begins to run on "the date on which the [state] judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). When a habeas petitioner has pursued relief on direct appeal through his state's highest court, his conviction becomes final ninety days after the highest court's judgment is entered, upon the expiration of time for filing an application for writ of certiorari with the United States Supreme Court. *Roberts v. Cockrell*, 319 F.3d 690, 693 (5th Cir.2003). However, "[i]f the defendant stops the appeal process before that point," ... "the conviction becomes final when the time for seeking further direct review in the state court expires." *Id*. at 694; *see also Foreman v. Dretke*, 383 F.3d 336, 338 (5th Cir.2004) (Section 2244(d)(1)(A) gives alternative routes for finalizing a conviction: either direct review is completed or the time to pursue direct review expires).
>
> Although federal, not state, law determines when a judgment is final for federal habeas purposes, a necessary part of the finality inquiry is determining whether the petitioner is still able to seek further direct review. *See Foreman*, 383 F.3d at 338–39. As a result, this court looks to state law in determining how long a prisoner has to file a direct appeal. *See Causey v. Cain*, 450 F.3d 601, 606 (5th Cir.2006); *Roberts*, 319 F.3d at 693.

*Butler v. Cain*, 533 F.3d 314, 317 (5th Cir.2008).

In this case, McKemie's conviction became final, for federal limitations purposes, on July 8, 2010, ninety (90) days after the Louisiana Supreme Court completed review of his

writ application following direct appeal, when he did not file a writ of certiorari with the United States Supreme Court.    *Ott v. Johnson*, 192 F.3d 510, 513 (5th Cir. 1999) (period for filing for certiorari with the United States Supreme Court is considered in the finality determination under 28 U.S.C. § 2244(d)(1)(A)); U.S. Sup. Ct. Rule 13(1).    Under a plain reading of the statute, he then had one year within which to file his federal *habeas* petition, or a deadline of July 8, 2011.    He did not file his federal *habeas* petition with this Court until October 21, 2015.    Thus, his application must be dismissed as untimely, unless that deadline was extended through tolling.

B. *Statutory Tolling*

        The Court finds no basis for statutory tolling in this case.    Regarding the statute of limitations, the AEDPA expressly provides: "The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection."    28 U.S.C. § 2244(d)(2).    However, McKemie concedes he had no such applications pending before the state courts during the applicable one-year period.    The one-year federal limitations period continued to run interrupted and expired on July 8, 2011. His state-court application for post-conviction relief was not filed until February 17, 2014, well *after* the one-year federal limitations period had already expired, and therefore could not possibly afford him any tolling benefit.    *See Scott v. Johnson*, 227 F.3d 260, 263 (5th Cir. 2000); *Magee v. Cain*, Civ. Action No. 99–3867, 2000 WL 1023423, at *4, *aff'd*, 253 F.3d 702

(5th Cir. 2001); *Williams v. Cain*, Civ. Action No. 00–536, 2000 WL 863132, at *2 (E.D. La. June 27, 2000).    Simply put, once the federal limitations period expired, "[t]here was nothing to toll."    *Butler v. Cain,* 533 F.3d at 318; *see also Lookingbill v. Cockrell*, 293 F.3d 256, 265 (5th Cir. 2002) (missing the AEDPA deadline by even a few days nevertheless renders a federal petition untimely).    Because McKemie had no other state applications pending at any time during the one-year limitations period, he clearly is not entitled to any tolling credit pursuant to § 2244(d)(2).

C. *Equitable Tolling*

The United States Supreme Court has held that the AEDPA's statute of limitations is subject to equitable tolling.    *Holland v. Florida*, 560 U.S. 631, 645-648 (2010).    However, "a petitioner is entitled to equitable tolling only if he shows (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing."    *Id.* at 649 (internal quotation marks omitted); *see also Davis v. Johnson*, 158 F.3d 806, 811 (5th Cir. 1998) (holding that the AEDPA's statute of limitations can be equitably tolled "in rare and exceptional circumstances").    A petitioner bears the burden of proof to establish entitlement to equitable tolling.    *Alexander v. Cockrell*, 294 F.3d 626, 629 (5th Cir. 2002).

McKemie claims he is entitled to equitable tolling because he paid IAG Law Group to represent him for post-conviction proceedings, but they misled him and filed nothing on his behalf.    The State does not address whether or not these facts establish extraordinary

circumstances that prevented him from filing timely, arguing simply that equitable tolling should not apply, regardless, because McKemie failed to diligently pursue his rights to relief. Because the record demonstrates a lack of diligence on the part of McKemie in pursuing relief, the Court agrees that McKemie is not entitled to equitable tolling.

Attorney misconduct, such as deception and abandonment by counsel, can be considered a "rare and extraordinary" circumstance for the purposes of equitable tolling. *Holland*, *supra*; *United States v. Kelly*, 11-155, 2015 WL 1897595, at *4 (E.D. La. Apr. 27, 2015) (citing *United States v. Wynn*, 292 F.3d 226 (5th Cir. 2002); *Manning v. Epps*, 688 F.3d 177, 184 n. 2 (5th Cir. 2012) (citing *Maples v. Thomas*, 132 S.Ct. 912, 924 (2012)).    However, as the United States Fifth Circuit Court of Appeals has noted, "*Holland* did not hold that attorney misconduct alone could justify equitable tolling.    Rather, *Holland* illustrates that a prisoner must diligently pursue his rights in the face of extraordinary circumstances."    *Tsolainos v. Cain*, 540 F. App'x 394, 398 (5th Cir. 2013) (citing *See Holland*, 130 S.Ct. at 2565).    Neither the fact that a petitioner retains counsel for collateral review nor that the attorney may have been ineffective eliminates a petitioner's obligation to exercise "reasonable diligence." *Manning*, 688 F.3d at 185.    Equitable tolling requires that a petitioner show he acted with reasonable diligence during the time period he seeks to toll.    *Holland*, 560 U.S. at 653-54. Therefore, McKemie must first establish that he pursued his rights with reasonable diligence.

In this case, McKemie does not dispute that he was aware of the applicable time limitations under both state and federal law, which began to run on the date his conviction

became final (*i.e.*, July 8, 2010).    With approximately three months remaining in the one-year federal limitations period, on April 23, 2011, his fiancée hired IAG Law Group to provide him post-conviction legal assistance.    McKemie submits the contractual agreement, receipts, and correspondence he received from the law group to support his argument for equitable tolling.[16]

McKemie alleges in his federal application that he and his family made repeated inquiries on the progress of the case and were informed that "everything was fine" and even assured that "something had been filed to stop the running time."[17]    He points to no specific, objective record evidence to support his allegations.    Nor do these purported assurances appear in the IAG correspondence, which McKemie references generally.    The only evidence in support appears to be an affidavit submitted by his fiancée, Aimee Richard, in which she states that she inquired in December 2011 (eight months after entering the agreement) and was told that a writ of certiorari had been filed on his behalf in November 2011.[18]    The correspondence McKemie submits from IAG does not reference, much less

---

[16]    The letters reveal frequent changes in the attorneys and law clerks affiliated with the group, continual changes in local addresses, requests to send materials and payment to a different post-office box address located in the State of Georgia, and attempts to reassure clients that the company was legitimate and not a "scam," as had been widely rumored in the prison.    *See, e.g.*, letters dated July 25, 2011 and August 3, 2011.    (Rec. Doc. 3, Exhibit 2; State Rec., Vol. 3 of 3, Appendix to Writ No. 2014-KW-0610).

[17]    Rec. Doc. 3, p. 31.

[18]    Rec. Doc. 3, Exhibit 2, p. 39.

confirm, any state-court filings having been made.    In fact, the first mention of any *planned* filing is made in a letter dated January 25, 2012, wherein it is represented "[w]e are now preparing to file proper paperwork with the federal courts to help us to proceed federally as opposed to the state. We feel that if your case were re-presented before the State of Louisiana that you would not receive a fair chance, so a federal writ of habeas would be the best route for us to travel." [19]    This seemingly contradicts any representation that state-court proceedings were ever initiated or pending.

Eventually, all communications from the law group ceased.    Indeed, the record reflects the last correspondence from the group, addressed to "valued client" and simply advising of a new address, was dated June 1, 2012.    An invoice shows that final payment in full was made to the law group and received on March 23, 2012.    A notarized letter from McKemie's father reflects that he had not heard from the group since final payment.    An affidavit from McKemie's fiancée likewise states that after this time her phone calls were not returned.    Only after communications ceased, in July 2012, did she begin inquiring with the Louisiana courts and confirm that no post-conviction pleadings had been filed on McKemie's behalf.

In mid-2013, it appears that McKemie and his family began to pursue legal action against the law group and specific attorneys with whom they had dealt, sending letters and

---

[19]    Rec. Doc. 1-2, p. 17 of 56.

complaints to numerous state agencies.[20]    During this same time period, however, the record reflects no action by McKemie in the Louisiana courts in pursuit of his claims for relief from his conviction or sentence.    McKemie alleges the following with respect to his diligence during this time period:

> When IAG was retained, petitioner had three (3) months left on his federal time and one year left on his post conviction time.    Petitioner repeatedly inquired about this [sic] the time but relied on the fact that IAG had it under control because that is what he was told by IAG numerous times.    In fact, petitioner did not realize that his time had run out until becoming increasingly frustrated with the attorney's at IAG, he inquired about someone else doing a post conviction for him because not only had IAG told him and his family that they had filed something to stop the time, of which he never received a copy of, after being paid in full, they would not return any calls or answer any letters, and after checking with the courts, nothing had been filed in his behalf.
> ****
> Petitioner, after finding out that his attorney's had misled him and failed to protect his post conviction and federal time pursuant to La. C. Cr. P. art. 930.8 and 28 U.S.C. 2244, he immediately began his search for help to file this present post conviction.    Petitioner has filed a complaint to the Louisiana Attorney Disciplinary Board and to the Attorney General.[21]

McKemie did not submit an application for post-conviction relief to the state courts until February 2014.    He did not file the instant federal application until October 2015.

---

[20]    McKemie references specifically complaints he filed with the Louisiana Attorney Disciplinary Board and the Attorney General.    The record includes these complaints, as well as a request for investigation with the state police.    He also inquired with the State Bar of Georgia, Consumer Assistance Program and the State of Georgia Governor's Office of Consumer Protection.

[21]    Rec. Doc. 3, pp. 32-33.

The circumstances set forth above fail to establish reasonable diligence by McKemie in pursing his rights.    As a threshold matter, McKemie waited more than nine months after his conviction became final to obtain assistance with post-conviction filings.    Once he was represented, despite highly questionable circumstances and a rumored scam, he continued to assume that work was being performed and that something had been filed in state court. He took no action during this time period to ensure that state-court or federal-court filings were, in fact, made on his behalf, even when correspondence he received suggested the exact opposite (*i.e.*, that nothing had been filed on his behalf as late as January 2012).    McKemie admits that he never received a copy of any documents purportedly filed in court throughout the term of the representation.    Nor, apparently, did he ask for them.    Even accepting as true that his fiancée was informed in December 2011, that a filing was made on his behalf in November 2011 (albeit after the federal deadline had run), he made no request to see the relevant paperwork and did not otherwise attempt to confirm the filing or to inquire about the status despite receiving no tangible results for many months.    No inquiry was made with the courts about filings until July 2012, after contact with the law group had ceased.

In *Manning*, the Fifth Circuit flatly rejected the suggestion that petitioner exercised reasonable diligence where for a period of 19 months after he knew his conviction became final, he relied on his appointed counsel to file his *habeas* petition without directing them to file the petition or inquiring into its status.    *Manning*, 688 F.3d at 184-186.    Similarly, in the instant case, one inquiry on the part of his fiancée in the two-year period after McKemie

knew his conviction was final and the limitations period was running hardly amounts to an exercise of reasonable diligence on McKemie's part.

Furthermore, even after communications with the law group terminated, despite McKemie's vague allegations that he "immediately began his search for help," he provides no explanation for why he waited another year and seven months (until February 2014) to file his state-court post-conviction relief application, and more than three years (until October 2015) to file his federal application, if he plainly knew or should have known in late summer of 2012 that his retained post-conviction legal counselors had ceased contact with him and done nothing on his behalf.    Perhaps he believed mistakenly that pursuing legal action for the fraud perpetrated by his legal counselors could bolster his subsequent belated filings, but still he failed inexplicably to simultaneously pursue his rights to relief from the aggravated rape conviction or sentence.    *See Alston v. Clarke*, 14-327, 2015 WL 5664289, at *4 (E.D. Va. Sept. 22, 2015) (Alston provided no evidence to show how the state bar complaint he filed against his attorney prevented him from pursuing his rights in federal court so as to justify equitable tolling); *Jackson v. Valenzuela*, 14-804, 2015 WL 1383583, at *3 (C.D. Cal. March 20, 2015) ("Petitioner opted to pursue *pro se* legal actions against counsel—first with the State Bar, then in Riverside Superior Court. Such pursuit of legal remedies against counsel—which are not themselves grounds for equitable tolling—is not indicative of diligent pursuit of his habeas claims.") (citing *Sanders v. Tilton*, 475 Fed. Appx. 118, 120 (9th Cir. 2012) (petitioner's pursuit of claims against counsel were independent of

his duty to diligently pursue his *habeas* claims); *Hammond v. Uribe*, CV12–3234–JSL(CW), 2012 WL 7145705, at *5 n. 3 (C.D. Cal. December 14, 2012) (no equitable tolling on account of the filing and pendency of a complaint against counsel with the State Bar), *order accepting* 2013 WL 571788 (C.D. Cal. February 12, 2013); *Gomez v. Scribner*, Case No. 07CV283–BEN (CAB), 2008 WL 4534059, at *5–6 (S.D. Cal. Oct.6, 2008) (equitable tolling unavailable when prisoner pursued state bar claims against attorney during statutory period rather than diligently pursuing *habeas* claims).    McKemie's separate and independent claims arising from counsel's omissions in no way demonstrate diligent pursuit of his *habeas* claims for purposes of equitable tolling. And certainly, to the extent McKemie may have thought he was pursuing his rights by attempting to expose the alleged wrongdoing, ignorance of the law is insufficient to justify equitable tolling.    As the Fifth Circuit has made clear, mistake, ignorance of the law, and a prisoner's *pro se* status do not suffice to justify equitable tolling. *Johnson v. Quarterman*, 483 F.3d 278, 286 (5th Cir. 2007); *Cousin v. Lensing*, 310 F.3d 843, 849 (5th Cir. 2002); *Fierro v. Cockrell*, 294 F.3d 674, 682 (5th Cir. 2002); *Felder v. Johnson*, 204 F.3d 168, 171 (5th Cir. 2000); *see also Tate v. Parker*, 439 F. App'x 375 (5th Cir. 2011); *Mathis v. Thaler*, 616 F.3d 461, 474 (5th Cir. 2010) ([E]quitable tolling "is not intended for those who sleep on their rights").

The record therefore establishes a significant period of time when McKemie was not actively pursuing review of his conviction—only a limited portion of which can be attributable to hired counsel—and he presents absolutely no evidence to account for his

lengthy delay in seeking relief in this Court.    *See Tsolainos v. Cain*, 540 F. App'x at 397 (eight-month delay in filing federal petition once petitioner knew application was overdue and had fired his attorneys does not constitute reasonable diligence) (citing *Melancon v. Kaylo*, 259 F.3d 401, 408 (5th Cir.2001) and *Koumjian v. Thaler*, 484 F. App'x 966, 969–70 (5th Cir. 2012) (holding that petitioner had not shown reasonable diligence because his delay in filing "exceed[ed] four and a half months")).    Even assuming that his allegations regarding legal counsel rose to the level of extraordinary circumstances from the date of hire (April 23, 2011) until communication ceased and he discovered nothing had been filed (July 31, 2012), McKemie still did not act with reasonable diligence in pursuing *habeas* relief. *See Arita v. Cain*, 500 F. App'x 352 (5th Cir. 2012), *cert. denied*, 133 S.Ct. 1828, 185 L.Ed.2d 839 (2013) (finding that petitioner did not diligently pursue his rights despite the inadequate legal representation he received); *cf. Holland*, 560 U.S. at 653 (the petitioner not only wrote his attorney numerous letters seeking crucial information and providing direction, but he also repeatedly contacted the state courts, their clerks, and the Florida State Bar Association in an effort to have his attorney removed from his case, and the very day the petitioner discovered that his AEDPA clock had expired due to counsel's failings, he prepared his own habeas petition *pro se* and promptly filed it with the District Court); *United States v. Martin*, 408 F.3d 1089 (8th Cir. 2005) (Martin and his wife did everything in their power to stay abreast of the status of his case, and provided counsel with original documents to assist in the matter. When Martin lost faith in counsel after months of deception and neglect, Martin

filed a complaint with the California Bar. He also filed motions with the district court seeking an extension of time and the return of the documents he sent to counsel so that he could prepare a § 2255 motion. When those motions proved fruitless, Martin promptly filed a *pro se* § 2255 motion).   Because McKemie has not established that he pursued relief diligently, he is not entitled to equitable tolling.

*D. Actual Innocence*

Finally, the Court briefly addresses any claim McKemie may raise that the limitations period should be tolled because he is actually innocent of the crime for which he was convicted.   In *McQuiggin v. Perkins*, the United States Supreme Court held that "actual innocence, if proved, serves as a gateway through which a petitioner may pass... [to excuse] the expiration of the statute of limitations."   *McQuiggin v. Perkins*, 133 S.Ct. 1924, 1928 (2013).   The Supreme Court has cautioned, however, that "tenable actual-innocence gateway pleas are rare[.]"   *Id.*   To succeed on this claim, McKemie must present a credible claim of actual innocence based on "new reliable evidence... that was not presented at trial," and he "must show that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt" in light of that new evidence of his factual innocence. *Schlup v. Delo*, 513 U.S. 298, 324, 327 (1995).

McKemie has not met the rigorous burden of proof imposed under the actual-innocence exception.   He alleges only that the victim's testimony at trial was "unreliable," and therefore the evidence was insufficient to establish that he committed any crime.   He

offers no newly discovered evidence in support of the actual innocence claim and the record confirms that no such evidence exists.     Nor do his conclusory allegations suffice to undermine confidence in the outcome of trial.     *McQuiggin*, 133 S.Ct. at 1936.

The record facts as succinctly summarized by the Louisiana First Circuit on direct appeal established the following:

> Detective Corey Douglas Johnson of the Houma Police Department testified that on January 14, 2004, Kristy Rougeau, the victim's mother, came to the police department, accompanied by her friend, Dawn Chancey, and M.M., who was ten years old at the time. As a result of Rougeau's complaint against her ex-husband, the defendant, Detective Johnson began an investigation. The detective spoke with Rougeau, Chancey, the victim, and the defendant. Rougeau provided Detective Johnson with a letter from Dr. Robert Alexander, the victim's urologist. Detective Johnson made arrangements for the victim to be interviewed at the Child Advocacy Center and examined at Children's Hospital in New Orleans. The next day, the defendant was interviewed and then arrested and charged with aggravated rape. According to Detective Johnson, the defendant advised he did not do anything. Detective Johnson testified that the defendant admitted he slept in the nude sometimes, even when the child slept in the bed with him and his wife. The detective stated he asked the defendant whether he found that to be inappropriate, and the defendant did not respond.
>
> A videotape of M.M.'s statement of January 14, 2004, was admitted in evidence at trial. M.M. stated the defendant would pick her up from Mulberry Elementary after school, take her home to his parents' house on Sunset Boulevard, undress her, and "put me on top of him and stick his thing in my choochie, that's my private." She also stated the defendant touched her "private." When asked if she knew where her private parts are, she pointed to her chest, genital area, and backside. The victim confirmed she would tell the defendant to stop, but he would not. She stated the incidents occurred when her mother was at work when they lived in the house on Sunset Boulevard with the defendant's parents. She stated his parents were in the other room and did not know. She stated she was eight years old and in first grade at the time. When asked what she noticed about the defendant's "private," she stated she did not look at it. When asked if she noticed anything about her "private"

after these occurrences, she stated her "pee would burn." When asked whether the defendant would move around or remain still when on top of her, the child stated she did not remember. Later, when asked whether the incidents occurred when they lived in other houses, she stated they occurred at a white house as well, when she was in second grade.

Rougeau testified that she and the defendant moved in together in December 1998, were eventually married, and were divorced in September 2002. During the marriage they had a son. They moved several times during the marriage. Rougeau and the defendant divorced because of distrust, money issues, and emotional abuse. At the time of the separation, she was not aware of any complaints by her daughter against the defendant. During the marriage, there were two incidents, which she now sees as signs of sexual abuse. On the first occasion, she fell asleep in her son's room. She heard M.M. talking in the middle of the night, so she walked across to her own bedroom, where M.M. was in the bed. M.M. said, "Mr. Chris won't let me put my pan ties on." The child's underpants were off. Rougeau asked the defendant what was going on, and he said, "I don't know. She must have done it in her sleep." The victim was about six years old at the time and sometimes slept in their bed because they could not get her to sleep in her own bedroom. The second incident occurred in the winter of 2001. M.M. was again sleeping in bed with her mother and stepfather. She was wearing one-piece pajamas. Rougeau heard her daughter making noises, rolled over, and noticed that her pajamas were unzipped all the way down in front. Rougeau zipped the pajamas up and placed the child on the other side of her, away from the defendant. Approximately, two months later, in January 2002, she and the defendant were separated.

Ten months later, in November 2002, at M.M.'s eighth birthday party, the child, for the first time, mentioned something to her mother about the alleged sexual abuse. M.M. said that whenever she would get home from school, the defendant would make her lie with him, after she took off her school uniform, before changing her attire to her play clothes. Rougeau was at work, and the defendant was not employed. Rougeau testified that she did not ask her child any more about it at the party. She ultimately asked the victim if the defendant touched her, and she responded negatively.

Rougeau testified that although M.M. had always been a sweet, well-behaved child, she started to change in October 2003. She became defiant, began having problems at school, started having nightmares, and did not want to sleep by herself. At one point, she began to hear voices in the school bathroom. At this

time, M.M. expressed a desire to live with her biological father. Additionally, she had an incident at school where she was seeing and hearing things that were not there. Rougeau contacted a social worker, Janet Buescher, and told her about the behavioral problems. The counselor said the victim might be trying to pit her mother and father against each other. One week after this incident at school, the victim again told her mother about the alleged abuse by her stepfather. She had just been dropped off at home by her father, and she was totally uncontrollable. She was screaming, and Rougeau had to hold her down to keep her from running out of the house. Rougeau took her to Terrebonne General Hospital to talk to a doctor and to get her calmed down. The victim did not attend school the next day. Dawn Chancey came over, and the victim told her mother and Chancey, "Mr. Chris touched ... [m]y privates." When Rougeau asked her whether the defendant put anything inside her, the victim said, "his thing." The victim was in counseling at this time with Janet Buescher. Rougeau took the victim to the police department. She subsequently took her to Dr. Alexander, a urologist, for an examination and to Children's Hospital for a forensic examination.

Within a month after the disclosure, the victim became very scared. She was having hallucinations, seeing things, and hearing things. One night, she was seeing people outside the windows and hearing people on the roof. She stayed up all night. The next morning Janet Buescher referred her to River Oaks Hospital in New Orleans, where she was admitted and remained a patient for five days. Dr. Lincoln Paine, a psychiatrist, treated the victim at River Oaks Hospital. The hallucinations stopped, although, according to Rougeau, she "still does have some problems."

Rougeau further testified that the defendant had recently been allowed supervised visits with their son. After M.M. asked to live with her biological father in October 2003, she did so for approximately four weeks. She switched schools to Montegut Elementary at that time. The victim told her mother she desired to live at her father's house because she was afraid of the defendant. She felt safe at her father's house. Rougeau admitted her daughter can be manipulative when she wants something. She admitted the victim does pit her parents against each other. She also admitted that during her marriage with the defendant, the victim heard arguments between them and heard her say disparaging things about the defendant. Rougeau acknowledged her daughter is a very emotional child who strongly overreacts to things. She further stated that since the defendant's arrest, M.M.'s unruliness, nightmares, and hallucinations have not completely subsided. She now earns Ds and Fs in

school although she was once on the A–B honor role. Rougeau testified that she had never spoken in detail with her daughter about the sexual abuse.

Mary Pontiff Aucoin, the principal at Mulberry Elementary School, testified that M.M. seemed extremely frightened on several occasions at school. On December 2, 2004, M.M. came to the office looking extremely scared and shivering. M.M. told the principal her stepfather was at school for parent luncheon day, visiting his son from a different marriage who was M.M.'s age. On another occasion, M.M. said she saw the defendant outside the window. The principal testified she did not know whether it was true, but M.M. appeared frightened. The principal stated she at no time saw the defendant at school, but would not have been surprised if he was there on parent luncheon day. She stated M.M. "would almost be shaking. She would cry. She was just an emotional wreck." She testified M .M. previously made good grades, was a good child, and never appeared scared for any other reason. The principal stated M.M. "was not a child who had phobias or anything like that."

Dawn Chancey, a friend of the victim and Rougeau, testified she was present the first time M.M. disclosed she had been molested by the defendant. Chancey was at M.M.'s house for the birthday party in November 2002. She testified that the victim stated the defendant had "done something to her as far as touched her in spots she was uncomfortable with." M.M. did not give any specific details. Weeks later, the second disclosure to Chancey occurred. M.M. stated defendant "touched her private area and ... that he put his penis in her vagina." Chancey acknowledged the child used the correct anatomical words only after Chancey asked her questions to clarify what she meant. She testified that the victim initially called the defendant's penis "his thing." The victim stated it happened "several" or "many" times. Chancey further testified that M.M. disclosed that the defendant would "sit there and make her take off her clothes." Chancey testified that M.M. told her that she was afraid that if she told anyone, the defendant would do something to her or to her brother. Chancey testified that M.M.'s behavior began to change for the worse a short time after she made the disclosures.

The victim testified that she was born on November 3, 1994. She testified that she knew the difference between the truth and a lie. When asked whether the defendant ever touched her in an inappropriate way, she responded positively. When asked about her first recollection, she stated that he took off her clothes and that it usually happened during the day, while she changed from school to play clothes and also at other times. She stated it first occurred

on Goode Street. The victim could not remember how old she was at the time. She further testified, "He touched me with his hand on my private." She stated her name for her private was "choonie." She stated the next incident was in her mother's room at night when the defendant took off her shirt, shorts, and pan ties. She stated her mom was at work. She stated the defendant opened her legs and "stuck his private in my private." She stated she was laying facing up on the bed. She asked the defendant to stop, but he did not comply. When asked if he put anything on her private, she stated he put saliva on it. She stated he licked his hand and "then put it on my choonie." She stated this occurred in the white house on Commerce Street in Houma and it occurred plenty of other times, including occasions while they lived on Sunset Street. The defendant told the victim not to tell anyone.

M.M. began hearing voices and seeing people at night when she was trying to go to sleep while she was living on El Paso Street. M.M. talked to Janet Buescher and Dr. Paine about those experiences. According to the victim's testimony, her mother and Chancey were the first persons she told about the defendant touching her inappropriately. She testified that she saw the defendant at the parent luncheon day at school and that she was scared of him and started crying. She further testified that she saw him one more time after that, when she was on her way to camp. She stated the defendant was fixing a building on that occasion. She saw people and heard voices that did not actually exist, saying things like the defendant was going to take her brother (the defendant's biological son) away from her. This was the reason she had to go to the hospital. Since taking medicine, she no longer sees and hears things that are not there. On cross-examination, she admitted she would do almost anything to prevent a situation where her brother would go live with the defendant. She stated she could not remember whether the defendant was wearing clothes at the time of the molestation. When asked whether the defendant moved or remained still while on top of her, she responded she could not remember. When asked if recently the defendant had begun seeing his son again, M.M. responded affirmatively. When asked during re-direct examination whether the defendant's penis seemed hard or soft, she stated she was not sure. She stated she "wouldn't want to look" at the defendant's private part.

Dr. Robert Alexander, qualified by the court as an expert in the field of urology, testified that M.M. had been seen in 1998 when she was about four years old, for burning upon urination and a vaginal discharge. A catherized urine sample was taken, which was essentially clear, and there was no sign of a discharge. The examination was normal with no explanation found for the burning

sensation. In August 1999, she was seen again for a complaint of burning and redness in the vaginal area. She was treated at this time for a yeast infection that probably resulted from having taken antibiotics for an upper respiratory infection. She was next seen in October 1999 with a complaint of having burning intermittently for six months. Examinations were done, with an abnormal finding from the bladder but no sign of vaginal inflammation. Again, she had been taking antibiotics and had a urinary-tract infection. The fourth time she was seen, in August 2000, she complained of having burning for one week and of lower abdominal pain. Again, the doctor diagnosed a yeast infection. The last time she saw Dr. Alexander was on January 14, 2004, when her mother was concerned there had been sexual abuse during the time they were living with the defendant. An examination revealed the child's vaginal area appeared normal with no evidence of vaginitis or tearing. Her hymen was intact. While there were no signs of sexual abuse, the examination could not rule out that sexual abuse had occurred since any tearing would have had time to heal.

Dr. Scott Anthony Benton, qualified by the court in the field of pediatric forensic medicine, testified that the victim was examined (by another doctor) when she was admitted to Children's Hospital, where Dr. Benton works. She was nine years old and in third grade at the time. The victim gave a history of sexual abuse. She told the interviewing doctor it first occurred when she was in the first grade and around seven years old and continued throughout her mother's relationship with the defendant. She stated the defendant would undress her, put her on top of him, and put his "thing" in her "coochie." She also stated she would tell the defendant to stop, but he would not. She stated the defendant told her not to tell anyone. She further told the doctor interviewing her that after the sexual encounters, "When I would pee, it would burn." The vaginal examination was normal, with no evidence of acute trauma, injuries, or tears. There was no evidence, such as scarring, of remote injuries and no physical signs of abuse of the child. The hymen was normal with no signs of previous injury. Dr. Benton testified that one would not necessarily expect to see such evidence, however, even if there had been sexual abuse. Dr. Benton stated injury is rarely seen following rape. He stated it is not common to see an injury to the hymen even following penile penetration. He explained that the child's hymen is typical and is crescent shaped, allowing for penile penetration without tearing. He testified that, regardless, vaginal tearing would heal in just two weeks. The doctor concluded that a normal examination neither confirms nor denies previous sexual abuse. Dr. Benton also testified that delayed disclosure of sexual abuse by a child is not uncommon and that

most children disclose as a process, adding they, "move backwards a little bit before they eventually move forward."

During cross-examination, Dr. Benton stated they did not expressly question children regarding positioning during a sex act, and that there were no indications that the victim was specifically questioned in that regard. On re-direct examination, Dr. Benton testified that in hindsight, reported symptoms of urinary burning and vaginal inflammation deserved further analysis, adding that trauma is among the fairly limited amount of causes for such conditions. In accordance to referenced literature, Dr. Benton further stated when adults have sex with children and there's not a total regard for comfort, sometimes there can be injury to either the tissues or the urethra such that afterward the child experiences burning upon urination.

Dr. Lincoln Paine, qualified as an expert in the field of psychiatry, saw M.M. when she was admitted to River Oaks Hospital. He noted all of the behavior problems she was having and testified that her hallucinations could be the result of PTSD, following the alleged sexual abuse. On the other hand, according to the doctor, the hallucinations could be the result of a psychotic disorder, not related to her environment. After five days in the hospital, the doctor believed the child was doing better, and he no longer felt she had a psychotic process. He concluded she had PTSD instead and that she was depressed. He placed her on medication, Risperdal, which eliminated the hallucinations and calmed her down. Dr. Paine testified that post traumatic stress can begin soon after a traumatic event or years later. The doctor testified that the child's relationship with her mother was mixed and that she seemed to be angry with her mother at first. She expressed a desire to live with her biological father. The doctor testified that he did not speak with the child about the sexual abuse, which would ordinarily be addressed by her counselor in therapy. His work was to address the behavioral symptoms. He admitted that any traumatic event, other than sexual abuse, could have caused her symptoms.

Janet Buescher, qualified by the court as an expert in the field of clinical social work, testified that she initially saw M.M. on January 6, 2004, because she was hearing voices and having difficulty sleeping and because her behavior had deteriorated. She was having anxiety, was sometimes unable to leave her mother, and sometimes wanted to live with her biological father. She was in a chaotic state and very fearful. Ms. Buescher first diagnosed the victim with separation anxiety disorder, but after hearing of her statements at River Oaks

and to the police, she diagnosed her with PTSD following sexual abuse. Nonetheless, Ms. Buescher acknowledged she could not confirm the traumatic cause of the victim's condition. She testified that the recall of children with PTSD is sometimes there and sometimes not. It is not uncommon to get different answers to a question from such a child on different occasions. While talking to the victim at a time when the instant trial was scheduled, the victim told her the defendant put his "thing" in her private almost every day from the time she was three years old until he left her mother. Ms. Buescher did not speak with the victim about the details of the sexual abuse. In the four appointments Ms. Buescher had with the victim prior to her going to River Oaks, M.M. did not tell Ms. Buescher anything about sexual abuse. Ms. Buescher testified that M.M. is a strong-willed child with a serious power problem, meaning she has the need to not let anyone control her and a need to win. She expresses concerns about pitting her friends against each other and is manipulative. She has problems with her temper. She had strong feelings about her mother and biological father. She was clingy with her mother at times and angry with her at other times. At times she seemed to have a strong attachment to her father and wanted to live with him.

The defendant testified at trial that he believed M.M. was a normal child, but that she was too old at age six to be sleeping in bed with him and her mother. He denied ever telling the police that he slept in the nude when the victim was in the bed and testified that he did not sleep in the nude when the victim was present. He strongly denied that he ever acted inappropriately with the victim, and he specifically denied touching her vagina or having sexual intercourse with her. He stated that because of the accusations against him, he was incarcerated and prohibited from seeing his son for three years. The defendant denied ever having gone to Mulberry Elementary to attend a parent luncheon day. He stated he was required by a restraining order and by his bond agreement to stay away from M.M. and her mother. He stated he was instead in New Orleans working in a chemical plant that day.[22]

Based on this record and contrary to McKemie's assertions, given the victim's credible, consistent testimony at trial, supported by medical expert testimony, mere allegations regarding the victim's questionable reliability or suggestions that the evidence supported

---

[22] *State v. McKemie*, 2009 WL 3030743, at *2-8.

only a lesser verdict of sexual battery certainly do not establish that he was factually innocent of aggravated rape. McKemie has not made the necessary showing by new evidence that he is actually innocent of the crime for which he was convicted. *Schlup*, 513 U.S. at 316.

In sum, the instant petition was filed more than four years after the federal limitations period expired. McKemie has not established that the limitations period was tolled or that the actual-innocence exception applies. Therefore, his federal *habeas corpus* petition should be dismissed with prejudice as untimely.

## RECOMMENDATION

**IT IS RECOMMENDED** that McKemie's application for federal *habeas corpus* relief be **DISMISSED WITH PREJUDICE** as untimely.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir.1996) (en banc).[23]

[23] *Douglass* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.

New Orleans, Louisiana, this __21st__ day of _____ October _____.

2016.

**MICHAEL B. NORTH**
**UNITED STATES MAGISTRATE JUDGE**